UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
FELICIA PEREYRA,                                  :
                                                  :
                        Plaintiff,                :
                                                  :           **OPINION AND ORDER**
              -against-                           :           10-cv-5873 (DLI)
                                                  :
MICHAEL J. ASTRUE,                                :
COMMISSIONER OF SOCIAL SECURITY,                  :
                                                  :
                        Defendant.                :
                                                  :
                                                  :
------------------------------------------------------- x
**DORA L. IRIZARRY, U.S. District Judge:**

      Plaintiff Felicia Pereyra ("Plaintiff") filed an application for Social Security Disability

("SSD") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act") on

March 29, 2007. Plaintiff alleged her disability began on December 31, 2006, due to

hypertension, embolism and thrombosis of veins, and lumbar scoliosis. By a decision dated

February 20, 2009, Administrative Law Judge Jeffrey Jordan ("ALJ") concluded that Plaintiff

was not disabled within the meaning of the Act. On October 21, 2010, the ALJ's decision

became the Commissioner's final decision when the Appeals Council denied Plaintiff's request

for review.

      On December 17, 2010, Plaintiff commenced the instant action seeking reversal of the

Commissioner's decision and remand solely for the calculation of benefits. The Commissioner

moved for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the

denial of benefits. (*See* Def.'s Mem. of Law in Supp. of His Mot. for J. on the Pleadings, Dkt.

Entry 12.) Plaintiff cross-moved for judgment on the pleadings, asserting that the ALJ's

determination that Plaintiff could perform sedentary work is flawed because it is not supported by

a treating physician's opinion and it fails to properly assess Plaintiff's credibility. Further, Plaintiff argues that the court should remand for calculation of benefits only because the record is complete and provides substantial evidence of Plaintiff's disability. (*See* Mem. of Law in Supp. of Pl.'s Cross Mot. For J. on the Pleadings and in Opp'n to Def.'s Mot. for J. on the Pleadings, Dkt. Entry 14 ("Pl. Mem.").)

For the reasons set forth more fully below, the Commissioner's motion is denied, and Plaintiff's motion is granted in part and denied in part. Plaintiff's motion is granted to the extent that it seeks remand based on the ALJ's failure to properly apply the treating physician rule and determine Plaintiff's credibility, and denied to the extent Plaintiff seeks this court to issue a finding that Plaintiff is disabled.

## BACKGROUND

### I. Testimonial and Self-Reported Evidence

#### A. *Hearing Testimony*

##### 1. Plaintiff's Testimony

Plaintiff alleges she became disabled on December 31, 2006 and has not worked since then. (R. 34, 132.)[1] Plaintiff claims to suffer from hypertension, embolism and thrombosis of the veins, and lumbar scoliosis. (*Id.* at 132.) According to Plaintiff, she also stopped working because she had a blocked coagulation in her leg that caused her leg and foot to swell "very much." (*Id.* at 35.) Plaintiff also had pain in the lower right side of her back that worsened over time. (*Id.*) On January 8, 2009, Plaintiff appeared with counsel and testified before the ALJ to

---

[1] "R." citations are to the correspondingly numbered pages in the certified administrative record. (*See* Dkt. Entry 15.)

review her disability claim. (*Id.* at 25-54.) A Spanish interpreter was also present to assist in the proceeding. (*Id.* at 25.)

Born in the Dominican Republic on June 9, 1950, Plaintiff became a United States citizen in the 1970's. (*Id.* at 29-30.) Plaintiff is married but lives with her daughter and her daughter's family. (*Id.*) Plaintiff completed college in the Dominican Republic in the 1990's and received a degree in business administration. (*Id.* at 31.) The only job Plaintiff has held in the past fifteen years was in the Dominican Republic in the credit and collection department of Johnson & Johnson, where she collected money, kept records and archives, and recorded data by computer. (*Id.* at 34-35.) Plaintiff's job required her to sit 80 percent of the time and stand the rest of the time. (*Id.*) Plaintiff had to pick up papers weighing less than ten or five pounds in order to file them. (*Id.*)

At the hearing, the ALJ asked Plaintiff a series of questions regarding her exertional capabilities. Plaintiff testified that her legs swell when she sits or stands for long periods of time. (*Id.* at 37.) When the ALJ asked Plaintiff how long she could sit in an eight-hour workday, Plaintiff stated she could sit for less than an hour and explained that, even while sitting in the hearing, she wanted to get up. (*Id.*) According to Plaintiff, she could stand for "maybe half an hour." (*Id.*) Plaintiff testified that she could walk one or two blocks, but her back hurt a lot. (*Id.*) Plaintiff was unsure of how much weight she could lift, but things she picks up fall from her hands. (*Id.*) Plaintiff has numbness in her hands and legs, which, according to Plaintiff, her doctor attributed to pinched nerves due to Plaintiff's disc problem. (*Id.* at 37-38.)

Next, Plaintiff's attorney questioned Plaintiff regarding her prior work. According to Plaintiff, her employers fired her because she was unable to perform her work. (*Id.* at 38.) Plaintiff explained that, when she did work, she worked only three to four hours daily, as per her

doctor's instructions. (*Id.* at 39.) Plaintiff's attorney asked her if she could do her previous job, and Plaintiff responded, "I wish I could, I wish I could. I really loved my job, I, I really can't." (*Id.* at 40.)

Plaintiff also testified about her daily activities. Plaintiff stated that she can no longer cook because she gets dizzy from her vertigo, her hands get numb, and things fall from her hands. (*Id.* at 39.) Plaintiff also needed help bathing and putting her pants and shoes on because she could not bend down to her legs or tie her shoes. (*Id.* at 39-40.) According to Plaintiff, she was unable to bend because she "feels like something is pulling from my back." (*Id.* at 40.) Plaintiff is also unable to bend her neck. (*Id.* at 39.) Plaintiff then stated that, when she is seated for too long, her legs go numb and she will have to get up to move her legs because it is painful.[2] (*Id.* at 41.) According to the Plaintiff, "if I sit too long, it's bad, if I stand too long, it's bad. I just want to die." (*Id.* at 43.) Plaintiff is able to lie down for a couple of hours before her back becomes "tired" and she has to get up. (*Id.*)

Plaintiff testified that she takes Cyclobenzaprine at night and Niaprazine in the day for the pain. (*Id.* at 41.) Additionally, Plaintiff received three injections in her spinal column, which provided some help for the pain. (*Id.*) Plaintiff stated that her doctor told her to put her legs up and wear support stockings for the swelling in her legs. (*Id.* at 41-42.) The ALJ pointed out that the medical records do not support Plaintiff's assertion that her doctor told her to elevate her legs. (*Id.* at 44.) Plaintiff explained that her doctor told her to put pillows below her leg when she lies down, and when she is sitting she puts her legs up a little higher than her seat. (*Id.*) Plaintiff also testified that she had begun utilizing a cane more than a year ago because she has pain when she puts her left leg down. (*Id.* at 42.) She also needed the cane for balance. (*Id.*)

---

[2] At this time, Plaintiff stated, "Now I really have to get up." (R. 41.)

Plaintiff testified that for three days prior to the hearing she did not suffer from any vertigo, but on the day of the hearing she began to feel it again. (*Id.* at 42.) Plaintiff explained that when she turns her head in a rapid manner, she gets nauseous and dizzy.[3] (*Id.*) Plaintiff said that her doctor prescribed her medication, but it makes her drowsy.[4] (*Id.*) Plaintiff has a driver's license but does not drive due to her vertigo syndrome. (*Id.* at 32-33.)

The ALJ noted that, although Plaintiff claimed she has numbness, there is no evidence of nerve root compression in any of Plaintiff's MRI results. (*Id.* at 45.) In response, Plaintiff explained that when she told her neurologist that she drops things from her hands, he said it was because of her pinched nerve. (*See id.* at 45-46.) At the close of the hearing, Plaintiff's attorney referenced MRI results from August 18, 2007 and July 21, 2008 and noted that there were objective findings in the record regarding pressure on Plaintiff's nerves. (*Id.* at 49-50.) After reviewing the findings, the ALJ did not see any impairment causing numbness in Plaintiff's hands. (*Id.* at 51.)

## 2.    Testimony from Vocational Expert

The ALJ questioned Donald Silve, a vocational expert ("VE"). (*Id.* at 47-49.) According to the VE, Plaintiff's job as an accounts receivable bookkeeper is sedentary, the Specific Vocational Preparation is 6, and the procedures applied in the Dominican Republic to perform this job are the same as in the United States. (*Id.* at 48.) In determining whether there were any positions in the local and national economies that Plaintiff could perform, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's "age, education, and work experience; can lift and carry ten pounds occasionally; can stand and walk at least two hours, can sit at least six hours;

---

[3] The record indicates that at one point during the hearing Plaintiff became dizzy after she spun her head fast and needed to wait to come back into balance. (R. 38.)

[4] Plaintiff did not take the medication on the day of the hearing. (*Id.* at 42.)

can push and pull the same as for lift and carry; must avoid squatting, crawling, kneeling, and climbing ladders and ropes and scaffolds but can perform other postural movements occasionally; must avoid moving dangerous machinery and unprotected heights, and moving dangerous machinery also includes avoid driving." (*Id.* at 48-49.) According to the VE, the hypothetical individual could perform Plaintiff's past work. (*Id.*)

Later in the hearing, in response to the ALJ's determination that Plaintiff could perform sedentary work, Plaintiff's attorney argued that Plaintiff would be limited to less than sedentary work because of Plaintiff's chronic pain, caused, in part, by degenerative changes throughout her spine. (*Id.* at 51-52.) He further argued that Plaintiff would not be able to sit for the required six hours because of her back and leg pain. (*Id.* at 52.) To resolve this issue, the ALJ called the VE for a second time to clarify whether Plaintiff could still perform the work of an accounts receivable bookkeeper if she needed to stand for a period of ten to fifteen minutes, approximately every 30 to 60 minutes. (*Id.* at 52-53.) According to the VE, such an individual would not be able to perform the work of an accounts receivable bookkeeper. (*Id.* at 53.)

### B. *Adult Function Report*

On May 4, 2007, Plaintiff's sister, on behalf of Plaintiff, filled out an Adult Function Report. (*See id.* at 114-25.) Plaintiff reported that, about two years earlier, she started experiencing pain in her back and hips, and the pain has intensified. (*Id.* at 123.) Plaintiff described the pain as a stabbing pain in her lower back and legs that radiated to her lower legs. (*Id.*) Plaintiff experienced this pain every hour of every day, and standing, sitting, walking, and lying down on her back brought it on. (*Id.* at 124.) Twice daily for eight months, Plaintiff took two 500-mg tablets of Ultra-Strength Tylenol to relieve the pain. (*Id.*) The pills took effect after a half hour and provided relief from the pain for a couple of hours. (*Id.*) Additionally, in the

Dominican Republic, Plaintiff took Dolowin Forte for the pain. (*Id.*) Plaintiff took care of her own personal needs and grooming without help or reminders but she needed reminders to take her medicine. (*Id.* at 117.) Additional measures Plaintiff took to relieve the pain included using a cane, rubbing her back with pain releasing cream, and wearing a corset during the day. (*Id.* at 125.)

Before the onset of her condition, Plaintiff worked full time and took care of herself and her home. (*Id.* at 116.) However, for the past six months, Plaintiff's pain affected her ability to perform daily activities. (*Id.* at 123.) Plaintiff's daughter helped Plaintiff bathe because Plaintiff could not bend over or kneel. (*Id.* at 125.) Plaintiff's daughter also prepared all Plaintiff's meals because Plaintiff could not stand for long periods. (*Id.* at 117.) Due to Plaintiff's hip, back, and leg problems, she could not use public transportation because she could not go up and down the stairs. (*Id.* at 115.) Though Plaintiff rides in a car, she does not drive because she does not have a car and she could not sit for a long time. (*Id.* at 118.) Her back problems rendered her unable to lift heavy objects, and she is unable to kneel or squat. (*Id.* at 120.)

According to Plaintiff, her back and hips hurt "very much," and her left leg swelled when she was on her feet for long periods of time. (*Id.* at 122.) Plaintiff stated that she could not go out alone because she could not walk for two blocks, and when she does she has sit down for at least fifteen minutes. (*Id.* at 121-22.) When Plaintiff feels stressed, she gets terrible headaches and the left side of her neck gets swollen. (*Id.* at 122.) Any activity Plaintiff starts, she eventually stops so she can rest. (*Id.* at 121.)

## II.     Medical Evidence

### A.     *Lincoln Medical and Mental Health Center*

Plaintiff received treatment at Lincoln Medical and Mental Health Center from February 2007 to July 2008.

At a February 27, 2007 visit, an ultrasound of Plaintiff's left lower extremity ruled out deep venous thrombosis.  (*Id.* at 167.)  Plaintiff was diagnosed with embolism and thrombosis of other specified veins.  (*Id.* at 168.)  Plaintiff also was diagnosed with benign essential hypertension.  (*Id.* at 169.)

On March 2, 2007, Plaintiff was not in acute distress and was ambulatory.  (*Id.* at 185.) Plaintiff had varicose veins and peripheral pulses.  (*Id.*)  There was no edema, clubbing, or cyanosis.  (*Id.*)  On March 26, 2007, Plaintiff's benign essential hypertension was uncontrolled, but she was compliant with her medications.  (*Id.* at 179-80.)  Plaintiff was continued on Coumadin, but her doctors increased Lisinoril from 20mg to 40mg.  (*Id.* at 179.)  On April 10, 2007, Plaintiff reportedly had pain with movement and her symptoms increased at night.  (*Id.* at 175.)  On April 24, 2007, Plaintiff was not in acute distress and was ambulatory.  (*Id.* at 172.) Varicose veins and peripheral pulses were present.  (*Id.*)

Plaintiff also received treatment from a cardiologist on May 21, 2007 and June 18, 2007, (*id.* at 255-58), a gastroenterologist, (*id.* at 259-65), and a rheumatologist.  (*Id.* at 285-87.) Plaintiff met with a dietician on February 7, 2008 and February 21, 2008.  (*Id.* at 272-80.) Plaintiff was put on a treatment plan to treat her obesity and hypertension.  (*Id.*)

An MRI of Plaintiff's lumbar spine was performed on August 18, 2007.  (*Id.* at 220-21; 343-44.)  The MRI results showed a central disc herniation/protrusion at the level of L5-S1

impressing the thecal sac without causing direct compromise of the exiting nerve roots.  (*Id.* at 221.)  Minimal disc bulging was noted at L4-L5.  (*Id.*)

MRI results dated July 21, 2008 revealed mild lumbar levoscoliosis at Plaintiff's lumbar spine.  (*Id.* at 206, 345.)  The impression was mild scoliosis with disc bulges at L4/5 and L5/S1.  (*Id.*)  There was no significant spinal stenosis.  (*Id.*)  The L5/S1 neuroforamina was moderately narrowed.  (*Id.*)  The right L4/5 neuroforamina was mildly narrowed.  (*Id.*)  Despite Plaintiff's complaints of pain, radiographs of her left hip showed no osseous abnormality and no fracture or dislocation.  (*Id.* at 207.)

**B.**   ***St. John' Queens Hospital***

Plaintiff also received treatment at St. John's Queens Hospital between May 7, 2007 and June 25, 2008.  (*Id.* at 294-314.)  On May 7, 2007, an X-ray of the lumbosacral spine showed muscle spasm and disk space narrowing with a degree of canal stenosis at L5-S1.  (*Id.* at 314.)  There was straightening of the lordosis, compatible with muscular strain.  (*Id.*)  On July 23, 2007, Plaintiff complained that her symptoms remained constant.  (*Id.* at 311.)  There was tenderness over the lumbar spine.  (*Id.*)

On August 2, 2007, Dr. Naveen Goyal, a neurologist, examined Plaintiff in connection with her complaints of chronic lower back pain.  (*Id.* at 307.)  Plaintiff's symptoms reportedly increased with extended standing and walking.  (*Id.*)  On September 13, 2007, after reviewing the MRI results, Dr. Goyal diagnosed Plaintiff with lumbosacral radiculopathy.  (*Id.* at 306.)  Plaintiff took Altracet, Skelexin, and Naproxin to relieve her symptoms.  (*Id.*)

On October 31, 2007, Plaintiff complained of bilateral leg swelling.  (*Id.* at 304.)  There was 2+ edema in Plaintiff's legs bilaterally.  (*Id.*)  The impression was bilateral venous

insufficiency rule out lymphatic obstruction. (*Id.*) As part of her treatment plan, Plaintiff wore compression stockings. (*Id.*)

On November 8, 2007, the MRI showed L4-L5S1 nerve root compressing with disc desiccation. (*Id.* at 303.) Dr. Goyal diagnosed lumbosacral radiculopathy. (*Id.*) On November 14, 2007, there was no evidence of clinically significant deep vein thrombosis. (*Id.* at 309.) On January 17, 2008, Plaintiff was "doing well," though her condition remained unchanged. (*Id.* at 302.) There were decreased deep tendon reflexes bilaterally in the distal lower extremities. (*Id.*) There was decreased sensations in sciatic distal and bilaterally. (*Id.*) Lumbosacral radiculopathy was indicated. (*Id.*)

On May 15, 2008, Plaintiff felt 50 percent better, but she still had pain in her left hip and buttocks that increased with prolonged sitting or standing. (*Id.* at 301.) The exam showed decreased sensations in the left L5/S1 distally, positive motor examination, and positive tenderness to palpation over the left hip. (*Id.*) Deep tendon reflexes were 1+ in the left leg and 2+ elsewhere. (*Id.*) Plaintiff was diagnosed with left L5/S1 radiculopathy. (*Id.*) On June 11, 2008, there was 1+ pretibial edema bilaterally. (*Id.* at 300.) The impression ruled out bilateral deep vein thrombosis in the lower extremities. (*Id.*)

**C.      *Treating Physician, Dr. Augusto Lizarazo***

Plaintiff's primary care physician was Dr. Augusto Lizarazo of the Western Queens Health Associates. Dr. Lizarazo began treating Plaintiff on April 30, 2007. (*See id.* at 253-54.)

Results from a May 3, 2007 lumbosacral spine X-ray revealed degenerative changes with grade I anterolisthesis of L4 on L5 and disc space narrowing at L5-S1. (*Id.* at 228.) The paraspinal soft tissue contours were within normal limits. (*Id.*) Results from a May 25, 2007 stress test were normal. (*Id.*)

In a letter dated September 13, 2007, Dr. Lizarazo stated that Plaintiff was under her care for high blood pressure, lower back syndrome due to central disc herniation at the level of L5-S1 and osteoarthritis, peripheral vascular disease in the legs, difficulty walking, and vertigo syndrome. (*Id.* at 334.) Dr. Lizarazo also stated that Plaintiff's inability to sit or stand for long periods of time prevented Plaintiff from working. (*Id.*)

Duplex sonogram results from October 9, 2007 did not show significant deep vein thrombosis in Plaintiff's legs. (*Id.* at 215.) A bilateral duplex arterial system sonogram of the arteries of Plaintiff's legs was normal. (*Id.*) An X-ray performed on October 12, 2007 indicated that there was no osseous abnormality in either of Plaintiff's hands. (*Id.* at 216.) However, after a Bone Mineral Density Test was performed on October 17, 2007, Plaintiff was diagnosed with osteopenia. (*Id.* at 218.) On November 16, 2007 and December 13, 2007, Dr. Lizarazo made no abnormal findings on physical examination. (*Id.* at 241-44).

On March 28, 2008, Dr. Lizarazo filled out a Physical Residual Functional Capacity Questionnaire. (*See id.* at 337-41.) The questionnaire listed Plaintiff's high blood pressure, back syndrome due to lumbosacral herniated disc-radiculitis, vertigo syndrome, and anxiety. (*Id.* at 337.) Plaintiff's prognosis was "fair." (*Id.*) According to Dr. Lizarazo, Plaintiff's impairments have lasted or were expected to last at least twelve months. (*Id.* at 338.) Dr. Lizarazo noted Plaintiff's pain in her lower back and legs. (*Id.*) Plaintiff's pain and symptoms constantly interfered with Plaintiff's attention and concentration. (*Id.* at 339.)

According to Dr. Lizarazo, Plaintiff could walk one city block without rest or severe pain; sit for one hour before needing to get up; stand 30 minutes at a time; sit for less than two hours in an eight-hour workday; and stand/walk for less than two hours in an eight-hour workday. (*Id.*) Further, every half hour, Plaintiff needed to walk for fifteen minutes. (*Id.* at 340.) Plaintiff

needed a job that allowed shifting positions at will from sitting, standing, or walking. (*Id.*) She also needed a job that allowed unscheduled breaks. (*Id.*) Specifically, Plaintiff was capable of performing low stress jobs. (*Id.* at 339.) Plaintiff's legs should be elevated when sitting for prolonged periods of time. (*Id.* at 340.) Plaintiff needed a cane to stand or walk. (*Id.*) According to Dr. Lizarazo, Plaintiff could rarely lift or carry less than ten pounds, twist, or climb stairs. (*Id.* at 341.) Plaintiff could never stoop (bend), crouch, or climb ladders. (*Id.*) Dr. Lizarazo estimated that Plaintiff's impairments would cause her to miss work more than four days per month. (*Id.*)

On July 28, 2008, Dr. Lizarazo submitted another letter stating that Plaintiff could not sit or stand for extended periods of time and that she had difficulty walking. (*Id.* at 335.) According to Dr. Lizarazo, Plaintiff was still unable to work. (*Id.*)

### D.    *Consultative Examination*

On June 20, 2007, Plaintiff saw Dr. Luke Han after the Division of Disability Determination referred her for an internal medicine examination. (*Id.* at 187.) At this examination, Plaintiff's chief complaint was lower back pain and blood circulation problems. (*Id.*) Plaintiff developed deep vein thrombosis of her left leg because she stayed in bed for 20 days recovering from a stray bullet that hit her at the left lower extremity near her groin area. (*Id.*) Plaintiff took Coumadin and used an elastic stocking. (*Id.*) According to Plaintiff, when she sat for approximately a half hour to an hour, she felt what she described as "bone pain" in her lower back. (*Id.*) The pain, which Plaintiff attributed to a level eight or nine on a ten-point scale, radiated to her buttock and legs. (*Id.*) Medication had no effect. (*Id.*) Plaintiff used a store bought cane that enabled her to walk one or two blocks. (*Id.*)

Dr. Han reviewed Plaintiff's daily activities and observed Plaintiff's general appearance. According to Plaintiff, she could not cook, clean, do laundry, shop, or engage in child care. (*Id.* at 188.) Plaintiff could not drive. (*Id.*) Plaintiff could not stand for a long time because her feet start to swell. (*Id.*) She could not lift heavy things. (*Id.*) Plaintiff spent her time watching television and reading. (*Id.*) She bathed herself. (*Id.*) According to Dr. Han, Plaintiff appeared to be in no acute distress. (*Id.*) She could walk without a cane and her gait was normal. (*Id.*) Plaintiff could walk on heels and toes with difficulty. (*Id.*) Plaintiff could squat half way. (*Id.*) Plaintiff neither needed help changing for the exam nor getting on and off the examination table. (*Id.*) She was able to rise from the chair without difficulty. (*Id.*)

Dr. Han also made findings relating to Plaintiff's musculoskeletal system. Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (*Id.* at 189.) Plaintiff's lumbar spine showed forward flexion at 40 degrees, extension at ten degrees, lateral flexion at ten degrees bilaterally, and rotary movement at ten degrees bilaterally. (*Id.*) Plaintiff had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally. (*Id.*) Strength was 5/5 in upper and lower extremities, and her joints were stable. (*Id.*) Plaintiff had tenderness at the paraspinal muscle in the lumbar area bilaterally, but no muscle spasm or sciatic notch tenderness. (*Id.*) Plaintiff had edema in her legs, especially on the left side, and her left leg appeared slightly larger. (*Id.*) Plaintiff wore elastic stockings in each leg. (*Id.*) There was no muscle atrophy. (*Id.* at 190.) Her grip strength was 5/5 bilaterally. (*Id.*)

Dr. Han diagnosed Plaintiff with obesity, status post left leg deep vein thrombosis, lower back pain, and essential hypertension. (*Id.*) Plaintiff's prognosis was "fair" and she was

encouraged to lose weight. (*Id.*) According to Dr. Han, Plaintiff had "a mild to moderate restriction for activity requiring greater exertion as heavy lifting and carrying." (*Id.*)

Dr. Han examined Plaintiff again on November 7, 2008. (*See id.* at 315-19.) At this time, Plaintiff emphasized her low back pain and complained of her high blood pressure. (*Id.* at 315.) Additionally, Plaintiff had developed vertigo syndrome, which made her feel as if she was going to fall down whenever she turned her head or bent down. (*Id.* at 316.) After sitting for about a half hour to an hour, Plaintiff felt a "strong pain" in her lower back, which she described as a ten on a ten-point scale. (*Id.* at 315.) The pain radiated to Plaintiff's left buttock and both legs. (*Id.*) Medication did not provide complete relief. (*Id.*)

Dr. Han reviewed the MRIs of Plaintiff's lumbar spine dated July 21, 2008 and August 18, 2007. (*Id.*) Plaintiff did not appear to be in acute distress. (*Id.* at 317.) Plaintiff never walked without the cane. (*Id.*) With the cane, Plaintiff walked up to two blocks, but, without the cane, there was mild instability. (*Id.*) Plaintiff's stance was normal. (*Id.*) Plaintiff refused to walk on heels and toes or squat. (*Id.*) Plaintiff did not change for the examination. (*Id.*) Plaintiff got on the examination table independently, but her sister helped her get off. (*Id.*) Plaintiff did not have any difficulty rising from the chair. (*Id.*)

Dr. Han next examined Plaintiff's musculoskeletal system. Plaintiff's range of motion of her cervical spine was "difficult." (*Id.* at 318.) Plaintiff's forward flexion was to 30 degrees, extension to ten degrees, lateral flexion to 20 degrees, and rotary movement to 20 degrees. (*Id.*) There appeared to be no scoliosis, kyphosis, or abnormality in Plaintiff's thoracic spine. (*Id.*) Her lumbar spine showed forward flexion to 30 degrees, extension to ten degrees, lateral flexion to 30 degrees, and rotary movement to 30 degrees bilaterally. (*Id.*) Plaintiff's strength was 5/5 in her upper and lower extremities. (*Id.*) Her joints were stable. (*Id.*) Dr. Han examined Plaintiff's

back and found tenderness at the paraspinous of the lumbar area, especially on the left side. (*Id.*) However, there was no muscle spasm or sciatic notch tenderness. (*Id.*) Plaintiff's grip strength was 5/5 bilaterally. (*Id.*)

Plaintiff's diagnosis was the following: severe obesity; history of left deep venous thrombosis; degenerative disk disease, lumbar vertebrae; lower back pain; essential hypertension; and dizziness. (*Id.* at 319.) At this time, Dr. Han's prognosis was "guarded." (*Id.*) Dr. Han stated, "[t]he claimant had a moderate restriction for heavy lifting and carrying. She also should avoid driving or operating machinery due to her dizziness." (*Id.*)

Dr. Han also completed a Medical Source Statement of Ability to Do Work-Related Activities. (*See id.* at 320-26.) Dr. Han based his assessment on Plaintiff's lower back pain and MRI results. (*Id.*) According to Dr. Han, Plaintiff could occasionally lift/carry up to ten pounds. (*Id.* at 320.) Plaintiff could sit for 30 minutes at a time, stand for 30 minutes at a time, and walk for ten minutes at a time without interruption. (*Id.* at 321.) In an eight-hour workday, Plaintiff could sit for a total of two to four hours, stand for two to four hours, and walk for two hours. (*Id.*) Plaintiff's use of a cane to ambulate was medically necessary, but she could walk for a half a block without a cane. (*Id.*) Dr. Han also assessed that Plaintiff could occasionally reach and push/pull, and frequently handle, finger, and feel. (*Id.* at 322.) She could occasionally balance, stoop, kneel, and crouch. (*Id.* at 323.) Plaintiff could sometimes operate foot controls. (*Id.* at 322.) Plaintiff could never climb stairs/ramps, ladders, scaffolds, or crawl. (*Id.* at 323.)

With respect to Plaintiff's environmental limitations, Dr. Han concluded that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, or operating vehicles. (*Id.* at 324.) She frequently could tolerate humidity and wetness, dust, odors, fumes, and pulmonary irritants, as well as extreme cold or heat, and vibrations. (*Id.*) Dr. Han concluded

that Plaintiff could travel alone, and could ambulate without using a wheelchair, walker, or two canes.  (*Id.* at 325.)  Plaintiff could walk over rough or uneven surfaces for an entire block at a reasonable pace.  (*Id.*)  She could also use public transportation, climb a few steps without using a handrail, prepare simple meals and feed herself, care for her personal hygiene, and use paper files. (*Id.*)

### E.   *Dr. Vikas Varma*

Dr. Vikas Varma, a neurologist and pain management doctor, also treated Plaintiff.  (*See id.* at 352-56.)  Plaintiff went to Dr. Varma because she experienced worsening back pain, tingling to the back and leg, and progressive numbness, weakness, and severe pain in the left hip, groin, and leg.  (*Id.* at 355.)  Findings from a physical examination performed on September 3, 2008 indicate that Plaintiff had 5/5 strength in all muscle groups with no wasting, atrophy, or weakness.  (*Id.* at 356.)  Deep tendon reflexes were symmetric.  (*Id.*)  Gait was normal.  (*Id.*) Straight leg rising was positive in the right leg with severe back pain.  (*Id.*)  Range of motion of the lumbar spine was limited.  (*Id.*)  Dr. Varma diagnosed Plaintiff with low back pain, lumbar spasm, left leg lumbar radiculopathy and possible lumbar stenosis.  (*Id.*)  Dr. Varma administered epidural injections on October 7, November 11, and December 16, 2008.  (*Id.* at 352-54.)

### III.   **Physical Residual Functional Capacity Assessment**

On July 2, 2007, Disability Examiner, J. Battle, completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (*See id.* at 191-96.)  Based on the exam findings, Plaintiff had the capacity for sedentary work.  (*Id.* at 195.)   Plaintiff could occasionally/frequently lift and/or carry ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull for an unlimited amount of time.  (*Id.* at 192.)  The examiner based these conclusions on medical evidence from Lincoln Hospital dated

February 2007 through May 2007, including Plaintiff's history of left leg thrombosis since July 2005, no evidence of deep vein thrombosis as of February 2007, and no cyanosis, clubbing, or edema as of April 2007.  (*Id.*)  Additionally, the examiner relied on Dr. Han's examination in June 2007.  (*Id.*)

With respect to Plaintiff's postural limitations, Plaintiff could climb, balance, stoop, kneel, crouch, and crawl occasionally.  (*Id.* at 193.)  Plaintiff's pain and obesity was a limiting factor. (*Id.*)  Plaintiff also claimed she had relief of pain with over the counter pain relievers.  (*Id.* at 194.)  The interviewer also addressed Plaintiff's alleged symptoms and determined that Plaintiff's allegations of restrictions were partially credible.  (*Id.*)

## DISCUSSION

### I.      Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their  benefits  "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (quotation marks omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record,

a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand

by the court for further proceedings is appropriate when "the Commissioner has failed to provide

a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations."

*Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner

is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168

F. 3d 72, 83 (2d Cir. 1999). ALJs, unlike judges, have a duty to "affirmatively develop the record

in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*,

167 F. 3d 770, 774 (2d Cir. 1999) (quotation marks omitted).

## II.     Disability Claims

To receive disability benefits, claimants must be "disabled" within the meaning of the Act.

*See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof

on disability status and is required to demonstrate disability status by presenting "medical signs

and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as

well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also*

*Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520.  If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there.  First, the claimant is not disabled if he or she is working and performing "substantial gainful activity."  20 C.F.R. § 404.1520(b).  Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience.  Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.  *See* 20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, app. 1.

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") in steps four and five.  20 C.F.R. § 404.1520(e).  In the fourth step, the claimant is not disabled, if he or she is able to perform "past relevant work."  20 C.F.R. § 404.1520(e).  Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience.  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(f).  At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work.  *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002).

## III.    The ALJ's Decision

The ALJ followed the five-step procedure to make his determination that Plaintiff is not disabled.  (*See* R. 15-22).  The ALJ concluded that the first and second steps were met because: (1) Plaintiff has not engaged in substantial gainful activity since her alleged December 31, 2006 onset date through the date of the decision; and (2) Plaintiff's disorders of the lumbar spine and

Plaintiff's obesity constitute severe impairments. (*Id.* at 17.)  At step three, the ALJ determined that Plaintiff's impairments, individually or combined, did not meet one of the impairments listed in Appendix 1. (*Id.* at 18.)

At step four, the ALJ found that Plaintiff has the RFC to perform less than the full range of sedentary work. (*Id*.)  Specifically, the ALJ determined the following:

> [Plaintiff] is able to lift and carry 10 pounds occasionally; push and pull 10 pounds occasionally; stand and walk at least two hours in an eight-hour workday and sit for at least six hours in an eight-hour workday.  She must avoid squatting, crawling, kneeling and climbing on ladders, ropes, and scaffolds, but can perform other postural movements on an occasional basis.  She must avoid operating moving dangerous machinery (including operating a motor vehicle) and unprotected heights.

(*Id.*)

In reaching this conclusion, the ALJ gave "little weight" to the opinion of Plaintiff's primary treating physician, Dr. Lizarazo. (*Id.* at 21.)  According to the ALJ, Dr. Lizarazo's opinion was not supported by other medical evidence in the record. (*Id*.)  The ALJ accorded "significant weight" to the opinion of the consulting physician, Dr. Han, that Plaintiff has a mild to moderate restriction for activities requiring greater exertion, such as heavy lifting and carrying, and that she should avoid driving and operating machinery due to her dizziness. (*Id.*)  Further, the ALJ found that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with Plaintiff's RFC. (*Id.* at 19.)

Lastly, at the fifth step, the ALJ determined, pursuant to the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2, that Plaintiff is able to perform her past relevant

work as an account receivable bookkeeper as it is generally performed. (*Id.* at 21-22.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (*Id.*)

## IV.  Analysis

### A.  *Treating Physician Rule*

Plaintiff contends that the ALJ erred by not according the opinion of Plaintiff's treating physician the appropriate controlling weight. (*See* Pl. Mem. 19-21.)  A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F. 3d. 563, 567 (2d Cir. 1993) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)(2)).  The ALJ must consider the following factors to determine how much weight to give to the treating physician's opinion: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant but unspecified factors. *Id.*

The ALJ is required to provide "good reasons" for the weight accorded to a treating physician's medical opinion. *Schaal*, 134 F. 3d at 503-05. "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F. 3d 128, 133 (2d Cir. 1999) (quoting *Schaal,* 134 F. 3d at 505).  However, the ultimate determination that a claimant is "disabled" or "unable to work" is reserved to the Commissioner.  20 C.F.R. § 404.1527(d).  "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data

indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell*, 177 F. 3d at 133.

The ALJ found that Plaintiff had the RFC to perform less than the full range of sedentary work by giving "little weight" the opinion of Plaintiff's treating physician, Dr. Lizarazo, that:

> [Plaintiff] can sit for only up to one hour; stand up to one hour and walk up to one hour continuously and only for a total of two hours each within an eight-hour workday; lift and carry up to five pounds occasionally; totally avoid stress, respiratory irritants and marked changes in temperature and humidity, and that she was not able to travel via subway or bus.

(R. 21.)

According to the ALJ, he gave little weight to Dr. Lizarazo's opinion because he determined that the other medical evidence contradicted Dr. Lizarazo's opinion. (*Id.*) In support of this conclusion, the ALJ relied upon findings from the consultative examiner, Dr. Han. (*Id.*) The ALJ noted that, during the June 20, 2007 physical examination by Dr. Han, "[Plaintiff] was in no acute distress, her gait was normal and she could walk on her heels and toes without difficulty. . . . [T]here was full range of motion of the cervical spine with negative straight leg raising bilaterally." (*Id.* at 21.) Relying apparently upon Dr. Han's opinion, to which he gave "significant weight," the ALJ concluded that Plaintiff was capable of sitting for six hours in an eight-hour workday, and therefore had the RFC to perform sedentary work. (*Id.* at 20-21.)

The ALJ's reasoning that Dr. Lizarazo's opinion was not supported by other medical evidence based upon Dr. Han's opinion was erroneous. In concluding that Dr. Han's opinion contradicted Dr. Lizarazo's opinion, the ALJ adopted certain findings suggesting that Plaintiff has residual functioning capacity while ignoring other findings by Dr. Han that square with Dr. Lizarazo's opinion. For example, Dr. Han completed a Medical Source Statement of Ability to Do Work-Related Activities based on his assessment of Plaintiff's lower back pain and MRI

results, in which he concluded that Plaintiff could only sit for 30 minutes at a time, stand for 30 minutes at a time, and walk for ten minutes at a time without interruption. (*Id.* at 321.) Dr. Han also found that in an eight-hour workday, Plaintiff could sit for a total of two to four hours, stand for two to four hours, and walk for two hours. (*Id.*) This finding directly contradicts the ALJ's conclusion, purportedly based upon Dr. Han's examinations, that Plaintiff could sit for six hours in an eight hour workday. It also is consistent with, rather than contradictory to, Dr. Lizarazo's opinion that Plaintiff could only sit for two hours at a time. The ALJ had a duty to explain why she gave "significant weight" to portions of Dr. Han's findings as a reason to discount Dr. Lizarazo's opinion, while selectively ignoring other parts of Dr. Han's opinions that support Plaintiff's disability claim. *See Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (finding that the ALJ committed legal error where "[t]he ALJ assigned the medical source statements of [the doctors] 'very great weight,' but selectively adopted only the portions of each statement that were least supportive of plaintiff's application for benefits").

Indeed, whether Plaintiff can sit for an extended period of time during a workday is important in determining whether Plaintiff can perform sedentary work because sedentary work "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Perez v. Chater*, 77 F. 3d 41, 46 (2d Cir. 1996) (citing S.S.R. 83-10; 20 C.F.R. § 404.1567(a)). Moreover, the VE testified that if Plaintiff had to stand for 15 minutes every 30 to 60 minutes, she would not be able to perform her former job as accounts receivable bookkeeper. (R. 52-53.)

Therefore, because it is unclear as to the basis upon which the ALJ found that Dr. Lizarazo's opinion was not supported by other medical evidence and why he selectively adopted Dr. Han's findings, remand is appropriate.

**B.**     *The ALJ Erred in Assessing Plaintiff's Credibility*

Plaintiff asserts that the ALJ failed to apply the correct legal standard in determining Plaintiff's statements were credible only to the extent they were consistent with an ability to perform sedentary work. (Pl. Mem. 22-23.) The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *Taylor v. Barnhart,* 83 F. App'x 347, 350 (2d Cir. 2010). However, the ALJ is afforded the discretion to assess the credibility of a claimant and is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue*, 280 F. App'x. 20, 22 (2d Cir. 2008)). In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations. *See Peck v. Astrue*, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010). First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged. 20 C.F.R. § 404.1529(b); S.S.R. 96-7p. Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work. 20 C.F.R. § 404.1529(c)(1); S.S.R. 96-7p.

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant

has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart,* 687 F. Supp. 2d at 435. Where the ALJ neglects to discuss at length his credibility determination to the extent the reviewing court cannot decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding that the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

In determining Plaintiff's credibility, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were "not credible to the extent they are inconsistent" with the RFC assessment. (R. 19.) While the ALJ recited certain medical evidence, Plaintiff's daily activities and Plaintiff's description of joint, back, hip and leg pain, he provided no analysis as to how they led to the conclusory statement that her testimony is not credible in part simply because it conflicts with the RFC assessment. (*See id.*)

Moreover, the ALJ failed to consider all of the seven credibility factors pursuant to 20 C.F.R. § 404.1529(c)(3)(i)-(vii). While acknowledging Plaintiff's physical pain, the ALJ failed to

discuss the intensity, duration, and frequency of such pain.  For example, the ALJ did not include any discussion of Plaintiff's testimony that she experienced this pain every hour of every day. (*See* R. 124.)

With respect to Plaintiff's medication, the ALJ stated that Plaintiff's pain is relieved within 30 minutes of taking her medication for a period of two hours, and that Plaintiff neither has any side effects nor needs reminders to take her medication.  (*Id.* at 19.)  However, the ALJ failed to address other methods Plaintiff employed to relieve her pain.  Specifically, the ALJ did not include Plaintiff's use of a cane, pain releasing cream, and a corset.  (*See id.* at 125.)  Further, the ALJ did not discuss how Plaintiff must alternate between sitting and standing because she experiences pain in her legs when she sits for too long.  (*See id.* at 41.)

Accordingly, the ALJ failed to make a proper credibility determination in discounting Plaintiff's testimony, and the matter must be remanded for this independent reason.

**C.**     ***Remand Solely for the Calculation of Benefits***

Plaintiff argues that the court should make a finding that Plaintiff is disabled and remand solely for the calculation of benefits, because the record is fully developed and shows that Plaintiff is disabled.  (*See* Pl. Mem. 23-25).

Plaintiff is correct that where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the Second Circuit has] opted simply to remand for calculation of benefits."  *Rosa*, 168 F. 3d at 83 (citing *Balsamo v. Chater*, 142 F. 3d 75, 82 (2d Cir. 1998)).  However, "'where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.'"  *Id.* at 82-83 (quoting *Pratts v. Chater*, F. 3d 34, 39 (2d Cir. 1996)); *see also Williams v. Apfel*, 204 F. 3d 48, 50 (2d Cir. 1999)

(remand necessary where court "cannot say that the record in this case is sufficiently complete or persuasive with respect to disability").

On the current record, the court concludes that a finding of disability and remand for the calculation of benefits only is inappropriate. The record is incomplete and somewhat contradictory as to the extent of Plaintiff's disability and the types of physical tasks she can perform. Accordingly, the court cannot conclude that, by applying the correct legal standards, the substantial evidence requires a finding by the ALJ that Plaintiff is indeed disabled. *See Saxon v. Astrue*, 781 F. Supp. 2d 92, 106 (N.D.N.Y. 2011) ("In the case at hand, the ALJ's evaluation of the medical evidence was improper. However, this conclusion does not entitle plaintiff to an outright reversal for calculation of benefits."); *Fuller v. Astrue,* 2008 WL 2381628, at *9 (E.D.N.Y. June 5, 2008) (Remanding for further proceedings where "the record is incomplete and this Court cannot with certainty conclude whether [Plaintiff] was indeed disabled on the relevant dates; the evidence requires further weighing, in accordance with the proper standards, and additional investigation by the ALJ."). The ALJ must make this determination on remand by developing the record, applying the correct legal standards, particularly with respect to the treating physician rule and Plaintiff's credibility, and then re-weighing the evidence in accordance with the proper legal standards as described by the court herein.

**CONCLUSION**

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is granted to the extent that this action is remanded and denied in that the court declines to find Plaintiff is disabled and to remand solely for the calculation of benefits. This case is remanded pursuant to the fourth and sixth sentences of 42 U.S.C. § 405(g), for additional proceedings consistent with this opinion. Specifically, the ALJ is to set forth clearly his reasons for finding that other medical evidence in the record did not support the treating physician's opinion. The ALJ also must re-weigh Plaintiff's credibility, taking into consideration all of the applicable factors.


SO ORDERED

DATED:      Brooklyn, New York
            August 28, 2012


                              _____/s/_____
                              DORA L. IRIZARRY
                              United States District Judge